IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF FIRST SECURITY NATIONAL BANK** | **CIVIL ACTION NO.** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **DAN R. BAKER, RALPH N. BARBER, JR., RALPH N. BARBER, SR., JOHN A. CONWAY, JERRY G. GARDNER, CARL HOWINGTON, AND JOHN R. SMITH** | |
| **Defendants** | |

## COMPLAINT

Plaintiff, Federal Deposit Insurance Corporation ("FDIC"), as Receiver

("FDIC-R") for First Security National Bank, ("FSNB" or the "Bank"), states its

Complaint against the Defendants, and each of them, as follows:

## I.     INTRODUCTION

1.     On December 4, 2009, FSNB was closed and the FDIC-R was

appointed as receiver pursuant to 12 U.S.C. 1821(c).  At that time, the FDIC-R

succeeded to all the rights, titles, and privileges of FSNB and its depositors,

account holders, other creditors, and stockholders. 12 U.S.C. 1821(d)(2)(A)(i). The

loss to the Deposit Insurance Fund as a result of the failures of FSNB is currently

estimated at $43.5 million.

2.     FDIC-R asserts claims against two former FSNB officers –

Defendants Dan R. Baker ("Baker") and Ralph N. Barber, Jr. ("Barber Jr.")

("Officer-Director Defendants"), and against five former directors – Ralph N.

Barber, Sr. ("Barber Sr."), John A. Conway ("Conway"), Jerry G. Gardner

("Gardner"), Carl Howington ("Howington") and John R. Smith ("Smith")

("Director Defendants") (collectively Baker, Barber Jr., Barber Sr., Conway,

Gardner, Howington, and Smith are referred to as the "Defendants"), for

negligence and gross negligence in operating and managing the lending functions

of the Bank, such as approving loans in violation of the Bank's loan policies and

prudent lending standard.   The FDIC-R seeks compensatory damages and other

relief as a result of Defendants' tortious conduct (the "Damages").

3.     Collectively, the Defendants were charged with, among other

responsibilities, the responsibility of operating and managing the lending function

of the Bank.  But rather than manage the Bank's lending function in a safe, sound

and reasonable manner, the Defendants took unreasonable risks with the Bank's

loan portfolio, allowed irresponsible and unsustainable rapid asset growth

concentrated in high-risk and speculative acquisition, development, and construction ("ADC") and commercial real estate ("CRE") loans, disregarding regulator advice and criticisms regarding lending activities, violated the Bank's loan policies and procedures, and permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards.

4.     Each of the Defendants also routinely and regularly recommended and/or affirmatively voted to approve loans and other extensions of credit without adequately informing themselves of the relevant risks in connection with the approval of loans; failed to prevent violations of FSNB's loan policies; failed to discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent directors and officers would exercise under similar circumstances; and failed to exercise the degree of care that every man of common sense, however inattentive he may be, exercises under the same or similar circumstances  causing the Bank to suffer substantial damages.

5.     As described in detail below, the Defendants' negligence and gross negligence in their numerous, repeated, and obvious breaches and violations of the Bank's loan policy and procedures, underwriting requirements, banking regulations and prudent and sound banking practices are exemplified by 17 loans made between December 20, 2005, and February 19, 2008 (collectively "Loan Transactions"), which Loan Transactions collectively and proximately caused

3

damages to the Bank of an amount to be proven at trial, but in no event less than $7.596 million.

## II.   THE PARTIES

6.   FDIC-R is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§1811-1833(e), with its principal place of business in Washington, D.C. 12 U.S.C. §1821(d). FDIC-R is the successor to all rights, titles, powers, and privileges of FSNB, and of account holders, depositors, and stockholders with respect to FSNB and its assets, including, but not limited to, the claims against the former directors and officers as set forth herein.

### A.   Officer Defendants

7.   Baker was the CEO, President, acted as Chief Credit Officer ("CCO") and a director of the Bank from March 3, 1992, until FSNB was closed.  He was a member of the Bank's Earning Assets Committee ("EAC") from at least 2006 until FSNB was closed.

8.   Barber Jr. was a Senior Vice President, Senior Lending Officer and a director of the Bank from January 28, 2005, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

**B.**     **Director Defendants**

9.     As described more specifically below, each of the Director Defendants was a member of the Bank's EAC.

10.     Barber Sr. was Chairman of the Board of the Directors from June 25, 1985, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

11.     Conway was a director of the Bank from June 25, 1985, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

12.     Gardner was a director of the Bank from June 25, 1985, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

13.     Howington was a director of the Bank from June 25, 1985, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

14.     Smith was a director of the Bank from June 25, 1985, until FSNB was closed.  He was a member of the EAC from at least 2006 until FSNB was closed.

III.   **JURISDICTION AND VENUE**

15.    This Court has subject matter jurisdiction pursuant to 12 U.S.C. §1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and  28 U.S.C. §§ 1331 and 1345.

16.    This Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted the business of the Bank, in the State of Georgia.

17.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because a substantial portion of the events and/or omissions giving rise to the claims and Damages asserted herein occurred in this district.

IV.   **FACTS**

18.    FSNB opened for business on June 25, 1985, operating a main office in Norcross, Georgia and three full-service Atlanta metro market branches in Atlanta, Cumming and Canton, Georgia.  FSNB was wholly owned by its holding company, First Security Corporation ("FSC").

A.       **The Bank's Lending Operations and Concentrations**

19.    Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management.  Loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for

6

evaluating loans with similar characteristics.  It is also important in protecting the bank's capital which can erode from unsafe and unsound lending practices.

20.    Underwriting practices (which are described in Parts 364 and 365 of the FDIC Rules and Regulations, 12 C.F.R. § 364.100 et seq. and 12 C.F.R. § 365.1 et seq.) can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.  Underwriting practices also encompass the management and administration of the loan portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies and adherence to written underwriting policies.

21.    The foremost means to control loan quality and a good loan portfolio is by the loan approval process.  An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based.  The purpose of a loan approval process is to provide controls to ensure acceptable credit at origination.

22.    Risk diversification is a basic tenet of portfolio management.  12 C.F.R. §30, "Standards for Safety and Soundness" (Appendix B), requires banks to accord adequate consideration to concentrations of credit risk in their underwriting practices.

23.    Between January 2006 and December 2009, the Defendants increased CRE lending from $10.8 million to $35.73 million (peaking at $36.15 million in September 2009).  ADC loan concentration peaked at $106.3 million in November 2007, representing 81.65% of the Bank's total loans.  By February 2009, FSNB's ADC loan concentration was 313.79% of its total capital, reaching a high of 1440.03% of total capital by December 2009.  At one point in 2006 ADC and land loans reached more than 600% of the Bank's total capital.  CRE and ADC loans are known to be more speculative than other types of loans because, among other reasons, the lack of an inherent cash flow source of repayment, uncertainties of development and sale process, and the need for adequate secondary sources of repayment.  Prudent lending in this segment of banking requires careful underwriting, timely evaluation of, and response to economic trends impacting the industry, and strict adherence to prudent banking policies and standards, all of which the Defendants failed to do.

24.    In over-concentrating the Bank's loan portfolio in CRE and ADC loans, the Defendants also effectively "turned a blind eye" to FSNB's Loan Policy and prudent underwriting standards which recognized the need to closely monitor concentrations for adverse financial or economic conditions, stated that concentrations would be limited, and established guidelines for concentrations based on the perceived risk.

25.     Defendants failed to exercise even slight diligence, in that they knew or should have known that concentrating a loan portfolio in ADC/CRE loans increases a bank's risk for numerous reasons, including: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high ADC concentrations.  In short, concentrations of ADC/CRE loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment and monitoring of ADC/CRE loans, portfolio risk management, management information systems, market analysis, and stress testing.

26.     The Defendants were regularly provided with information of key economic indicators, such as housing sales and home prices, which were used in the underwriting process.  Despite receiving information showing a slowing of housing sales and peaking of home prices by early 2006, Defendants continued to approve high risk and speculative ADC and CRE loans, including the transactions which resulted in the Damages.

27.    By 2007, the Bank suffered a significant decline in asset quality. Despite this decline in asset quality and increasing negative economic indicators, the Defendants continued to approve ADC and CRE loans, including a number of the loans that resulted in the Damages suffered by the Bank.

28.    Exacerbating loan portfolio mismanagement and loan underwriting deficiencies, the Defendants continued to approve CRE and ADC loans between 2006 and 2009 in the face of deteriorating economic conditions, without hiring a qualified CCO to review and monitor credit decisions.

29.    As FSNB's loan portfolio grew, the concentration of CRE and ADC loans to Total Capital increased the risk to the Bank and, as the quality of those loans deteriorated, FSNB's capital levels and earnings eroded.

30.    As early as 2001, the OCC cautioned FSNB of deficiencies in its loan concentration risk management, particularly its ADC loans.  Between 2006 and 2009, Defendants were repeatedly cautioned and criticized by regulators about, among other things: lack of adequate risk management controls, overconcentration of ADC/CRE loans, lack of a qualified chief credit officer, and deficiencies in loan underwriting and credit administration, including but not limited to, inadequate documentation and loans in excess of loan-to-value ("LTV") limits.  The Defendants failed to heed the regulators' advice.

31.     When deteriorating real estate market conditions substantially reduced the appraised value of collateral supporting its CRE and ADC loans, FSNB's asset quality declined.  The Bank's adversely classified assets increased from $29 million as of March 31, 2008 to $51 million as of March 31, 2009.

32.     Due to the deficient underwriting, risk management, and credit administration allowed by the Defendants in approving CRE loans, FSNB was fatally exposed to the inevitable cyclical decrease in real estate values.  As real estate markets declined, the Bank's financial condition declined.  On December 4, 2009, OCC closed the Bank, and FDIC-R was appointed Receiver.

**B.     Loan Underwriting and Violations**

33.     FSNB had specific written policies and procedures governing the underwriting, acquisition and administration of loans: a General Loan Policy, Real Estate Loan Policy and Appraisal Policy (collectively, the "Loan Policy").  The Loan Policy intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure.  The relevant provisions of the Loan Policy include, but are not limited to:

   a.  For CRE loans, the "property income ratio must have a debt service coverage ratio of at least 1.20:1 after operating expenses and appropriate reserves for recurring capital requirements."

   b.  Appraisals and current surveys "are required on each real estate transaction."

11

  c. Term loans require the borrower to "have a proven record or earnings or cash flow to comfortably support the debt."

  d. Personal and business financial statements supporting proposed loans should be no older than 15 months, and tax returns should be no older than 16 months.  Tax returns were required on commitments exceeding $1 million.

  e. For CRE loans, the borrower "cannot borrow the down payment or equity portion of the mortgage."  In addition, all of the borrower's equity must be invested in "the acquisition, development or construction associated with a construction loan before the bank's loan funds are to be drawn."

  f. Applicable LTV and loan-to-cost ("LTC") ratio limits were as follows:

    i. Single Family Residential Construction loan – 80% LTV
    ii. ADC loan – 75% LTC
    iii. Land Acquisition loan – 65% LTV
    iv. Lot (developed) loan – 75% LTV

  g. Generally, real estate loan renewals "require a suitable reduction in the original principal balance plus all interest due to date."

  h. Guarantees on CRE loans were required without exception:

    i. "On construction loans, full guarantees of completion and payment will be required."
    ii. All residential real estate construction loans "are to be unconditionally guaranteed as to repayment of principal and interest by the project's principal sponsors."

34. The EAC had the authority to approve loans to any one borrower up to the bank's legal lending limit, which was 15% of the Bank's unimpaired capital; the limit ranged from a high of $2.5 million in 2006 to a low of $450,000 in 2009, shortly before the Bank closed.

35.     As detailed herein, the Bank suffered substantial damages from significant departures from safe and sound banking practices by the Defendants. Each of the Defendants repeatedly disregarded the Bank's Loan Policy and approved loans involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment.  Defendants repeatedly approved loans that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 33 above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

36.     Approvals of the following loans illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that damaged the Bank, and that constitute negligence and gross negligence.

37.     On March 21, 2006, Baker, Barber Sr., Barber Jr., Conway, Gardner, Howington and Smith voted to approve a $1,674,171 ADC loan under an officer guidance line of credit ("OGL") in the amount of $2,100,000 to a company with

the initials "MC"[1] for the development of a speculative five lot residential

subdivision in Roswell, Georgia.  Approving this loan violated the Loan Policy,

underwriting requirements, and safe and sound banking practices in at least the

following respects: the debt service coverage ratio was less than the 1.20 required

by the loan policy; Defendants failed to confirm borrower equity as required by the

loan policy; the LTV ratio for the OGL at origination was 75 percent, which

exceeded bank policy limits; the LTV ratio for the appraised value at origination

was 97 percent, which exceeded bank policy limits; the LTC ratio for the OGL

exceeded the bank policy limits of 80 percent; the bank financed over 96 percent of

the cost of the land acquisition in violation of the loan policy; the Bank provided

credit without the required unconditional guarantee of all project sponsors;

Defendants approved the loan despite inadequate documentation to support the

extension of credit; provision of an interest reserve without justification;

Defendants failed to properly analyze guarantor net worth and to verify guarantor

liquidity; Defendants failed to obtain appraisal at origination; Defendants failed to

comply with the "Disbursement of Loan Funds" process as provided in the

Construction Loan Agreement; and Defendants failed to avoid conflicts of interests

as Barber Sr. purchased participations in several of MC loans.  The negligent and

---

[1] For privacy reasons, the FDIC-R identifies the borrowers to the Loan
Transactions by initials only.  Defendants know or should know the borrowers by
the initials and the details of the Loan Transactions recited herein.

grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

38.     On September 19, 2006, Baker, Barber Sr., Barber Jr., Conway, Gardner, Howington and Smith voted to approve a $1,140,500 loan to a limited liability company with the initials "VH" for the purpose of acquiring raw land to be developed into 11 speculative residential lots.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:  the debt service coverage ratio was less than the 1.20 required by the loan policy; Defendants failed to confirm borrower equity as required by the loan policy;  Defendants approved the loan despite inadequate documentation to support the extension of credit; the Borrower lacked earnings and cash flow to support the debt; Defendants failed to properly analyze guarantor net worth and to verify guarantor liquidity; Defendants failed to obtain appraisal at origination; Defendants failed to obtain current tax returns from the guarantor; and Defendants extended the loan twice without justification.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

39.     On April 18, 2006, Baker, Barber Sr., Barber Jr., Conway, Gardner, Howington, and Smith voted to approve a $1,168,231 loan to **"TBE"** for the acquisition, development and construction of a single-family residence in Atlanta,

15

Georgia.  The above EAC members also approved a $101,260 increase on January 16, 2007 to cover engineering expenses from the City of Atlanta.  Approving this loan and increase violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the LTC ratio of the loans were made at 100 percent, exceeding the bank's policy limits; the LTC ratio became 97.9 percent upon the increase; Defendants failed to analyze borrower's cash flow and earnings to support the debt; failure to analyze debt service coverage; Defendants failed to sufficiently analyze Borrower liquidity; and Defendants failed to use current financial information.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

40.     On April 18, 2006, Baker, Barber Sr., Barber Jr., Conway, Gardner, Howington, and Smith voted to approve a $748,875 loan to **"TP"** for the acquisition, development and construction of a single-family residence in Cobb County, GA.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: Defendants failed to adequately review appraisal data, resulting in over-leveraging of the collateral properties; the LTV and LTC ratios exceeded bank policy limits; the loan failed to comply with borrower equity requirements; and borrower lacked the earnings and cash flow/liquidity to service the debt.  The

negligent and grossly negligent approval of the loan resulted in substantial

damages to the Bank and FDIC-R in an amount to be proved at trial.

41.     On December 19, 2006, Baker, Barber Sr., Barber Jr., Conway,

Howington, and Smith voted to approve a $1,575,000 loan to "**SC**," for the

purpose of purchasing land and the development and construction of ten

speculative condominiums.  Approving this loan violated the Loan Policy,

underwriting requirements, and safe and sound banking practices in at least the

following respects: Defendants approved the loan despite inadequate

documentation to support the extension of credit; defendants failed to obtain an

appraisal at origination; the Borrower lacked earnings and cash flow to support the

debt; repayment relied on financial strength of the guarantors to support the debt;

the Borrower was allowed to take back its own second mortgage at loan

origination, essentially creating a LTV of 104 percent; Defendants failed to obtain

required unconditional guarantee of all project sponsors; the income of the

guarantor was inadequate to service this debt; Defendants failed to properly

analyze guarantor net worth and to verify guarantor liquidity; most of the

guarantor's claimed income could be attributed to his wife, who was not a

guarantor; the loan terms provided for an interest reserve without justification; and

Defendants failed to confirm borrower equity as required by the loan policy.  The

negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

42.     On June 21, 2007, Baker, Barber Sr., Barber Jr., Gardner, Howington, and Smith voted to approve a $874,275 loan to "**WW"** for the acquisition of a half-acre lot and speculative construction of a single family home.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the LTC ratio exceeded bank policy limits; the loan terms violated debt service coverage requirements; the borrower lacked earnings and cash flow to support the debt; the borrower's financial statement showed low liquidity; Defendants failed to enforce borrower equity requirements; and Defendants failed to obtain unconditional guarantee of all project sponsors.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

43.     On January 16, 2007, Baker, Barber Sr., Barber Jr., Conway, Gardner, Howington, and Smith voted to approve an ADC officer guidance line of credit in the amount of $756,156 to "**WCH",** for the acquisition of a lot and the speculative construction of a single family home.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the LTV and/or LTC ratio exceeded bank policy limits; debt service coverage was less than 1.20 as required by the Bank's loan policy;

18

Defendants failed to obtain an appraisal or appraised value to support the loan; the Borrower lacked earnings and cash flow to support the debt; Defendants failed to properly analyze guarantor net worth; Defendants failed to obtain financial records from the borrower; Defendants failed to obtain investment of borrower equity prior to loan; and Defendants failed to obtain the required unconditional guarantee of all project sponsors.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

44.    Defendants' failures to discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent directors and officers would exercise under similar circumstances, and failures to exercise the degree of care that every director and officer of common sense, however inattentive he may be, exercises under the same or similar circumstances, caused the FDIC-R substantial damages.  With respect to each Defendant, as a result of that Defendant's negligence and gross negligence, FDIC-R seeks damages in at least the following amounts from at least the Loan Transactions for which each voted in approval:  Baker ($7.596 million), Barber Jr. ($7.596 million), Barber Sr. ($7.596 million), Smith ($7.596 million), Howington ($7.338 million), Gardner ($6.363 million) and Conway ($6.11 million).

## V. <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>

### <u>ORDINARY NEGLIGENCE UNDER GEORGIA LAW</u>

45.    FDIC-R re-alleges and incorporates by reference each of the allegations in paragraphs 1-44 of this Complaint as though fully set forth herein.

46.    Each of the Defendants owed FSNB a duty of care under statutory law, O.C.G.A. §§ 7-1-490, 51-1-2, and Georgia common law, to discharge the duties of their respective positions in good faith and exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  Also, each Defendant was obligated by statute and common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable rules and regulations of the Bank.  The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

47.    Defendants are not entitled to the application of the business judgment rule because, *inter alia*: (a) none of the Defendants' actions (or inactions) which form the basis of this negligence claim were taken in good faith; (b) Defendants

20

actions and inactions were not reasonably well-informed, in that Defendants ignored regulators' advice and criticisms regarding loan underwriting and risk management deficiencies; (c) Defendants repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations; and exposed the Bank to undue risk by overconcentrating in ADC/CRE loans without adequate risk management controls, despite regulator advice and criticisms related thereto; and by failing to exercise even slight diligence, as that term is defined in O.C.G.A. §51-1-4.

48.     Defendant Baker, as President, CEO, acting CCO and Director, among other duties, was responsible for the overall management of the Bank including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending function.  These duties included, but were not limited to, ensuring: that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending, that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practices, that the Bank complied with banking statutes/regulations, that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank, that he approved loans that complied with the

Bank's Loan Policy and prudent and sound lending practices, that he managed and supervised the Bank's management team and staff to ensure that they fulfilled their duties. Baker, in fact, possessed greater skill, knowledge, and intelligence in regards to banking practices and, as such, should be held to the standard of an ordinarily prudent person possessing these superior attributes.

49.    Defendant Barber Jr., as Senior Vice President, Senior Lending Officer and Director, among other duties, was responsible for ADC/CRE lending and had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending activities. These duties included, but were not limited to, ensuring: that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, ADC/CRE lending; the Bank adhered to its policies, procedures and controls, and; that the Bank complied with banking statutes/regulations and prudent and sound lending practices.

50.    The Officer Defendants had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting and credit administration practices were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank, and to exercise ordinary care and

diligence in the administration of the affairs of the Bank, including but not limited to in approving extensions of credit such as the Loan Transactions.  Defendants Baker and Barber Jr., as officers of the Bank, repeatedly failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.  As to Defendant Baker, his negligent and grossly negligent acts included, without limitation:

(i)   Pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

(ii)   Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;

(iii)   Causing FSNB to approve and fund loans in violation of the Loan Policy and prudent lending practices;

(iv)   Failing to obtain, analyze, and evaluate historical borrower and guarantor financial information required to assess the creditworthiness of the borrower and guarantor;

23

(v)     Causing FSNB to approve and fund loans based on inadequate collateral securing the loans;

(vi)    Causing FSNB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

(vii)   Causing FSNB to approve and fund loans without requiring adequate sources of repayment;

(viii)  Causing FSNB to approve and fund loans without adequately analyzing debt service coverage ratio values and borrowers' abilities to perform on the loans;

(ix)    Failing to adhere to the Bank's LTV ratio limits;

(x)     Failing to adhere to the Bank's LTC ratio limits;

(xi)    Failing to adhere to payment and renewal requirements by renewing credit without required payment of interest and principal reduction; and

(xii)   Causing FSNB to approve and fund CRE loans in which the project equity contribution from the borrower was not evaluated or was inadequate.

(xiii) Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(xiv) Failing to require officers and employees of the Bank to comply with the Bank's policies with respect to ADC/CRE lending;

(xv) Disregarding and failing to take appropriate steps to address criticisms and advice and criticisms by regulators with respect to the Bank's ADC/CRE lending; and

(xvi) Failing to meet the standard of care required by O.C.G.A. §7-1-490 and common law with respect to the administration of the Bank's affairs.

b. As to Defendant Barber Jr., his negligent and grossly negligent acts included, without limitation:

(i) Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;

(ii) Causing FSNB to approve and fund loans in violation of the Loan Policy and prudent lending practices;

(iii) Failing to obtain, analyze, and evaluate historical borrower and guarantor financial information required to assess the creditworthiness of the borrower and guarantor;

25

(iv)   Causing FSNB to approve and fund loans based on inadequate collateral securing the loans;

(v)   Causing FSNB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

(vi)   Causing FSNB to approve and fund loans without requiring adequate sources of repayment;

(vii)  Causing FSNB to approve and fund loans without adequately analyzing debt service coverage ratio values and borrowers' abilities to perform on the loans;

(viii)  Failing to adhere to the Bank's LTV ratio limits;

(ix)   Failing to adhere to the Bank's LTC ratio limits;

(x)   Failing to adhere to payment and renewal requirements by renewing credit without required payment of interest and principal reduction; and

(xi)   Causing FSNB to approve and fund CRE loans in which the project equity contribution from the borrower was not evaluated or was inadequate.

(xii)  Pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's

policies, banking statutes, and regulations, and prudent and sound lending practices;

(xiii) Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(xiv) Disregarding and failing to take appropriate steps to address criticisms and advice by regulators with respect to the Bank's ADC/CRE lending;

(xv)   Failing to implement and follow sound loan policy and credit administration practices; failing to follow the Bank's loan policy and failing to ensure that Bank personnel followed the Loan Policy; and

(xvi)  Failing to meet the standard of care required by O.C.G.A. §7-1-490 and common law with respect to the administration of the Bank's affairs.

51.    In addition to the duties set forth in paragraph 46 above, the Director Defendants had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting and credit administration practices were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank, and to exercise ordinary care and diligence in the

administration of the affairs of the Bank, including, but not limited to, the following:

a.   Informing themselves about proposed loans and the risks the loans posed to the Bank before they approved them;

b.   Engaging in meaningful deliberation and exercising independent judgment in connection with the review and approval or disapproval of loans;

c.   Approving only those loans that conformed with the Bank's internal policies;

d.   Confirming that any loans they approved were underwritten in a safe and sound manner;

e.   Ensuring that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.   Not approving loans that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss;

g.   Ensuring that any loans approved did not violate applicable banking regulations;

h.   Monitoring all lending activities within the Bank, including compliance with the Bank's written lending policies and any deficiencies in credit approving actions;

i.  Ensuring that approved loans did not create unsafe and unsound concentrations of credit.

52.    Defendants Barber Sr., Conway, Gardner, Howington and Smith acted negligently by routinely and repeatedly failing to conduct and direct the business and affairs of the Bank in a manner consistent with safe and sound principles of banking.  Defendants Barber Sr., Conway, Gardner, Howington and Smith also breached their statutory and common law duties of care and were negligent by, among other things failing and neglecting to perform their respective duties with due care and diligence, and otherwise taking or refraining from actions without first being reasonably informed with regard to the risks, as follows:

a.    Failing to follow reasonable, prudent, and non-negligent procedures for underwriting loans;

b.    Causing FSNB to approve and fund loans in violation of the Loan Policy and prudent lending practices;

c.    Failing to obtain, analyze, and evaluate historical borrower and guarantor financial information required to assess the creditworthiness of the borrower and guarantor;

d.    Causing FSNB to approve and fund loans based on inadequate collateral securing the loans;

e.    Causing FSNB to approve and fund loans based on inadequate, incomplete, inaccurate, or unrealistic appraisals of collateral;

f.    Causing FSNB to approve and fund loans without requiring adequate sources of repayment;

g.    Causing FSNB to approve and fund loans without adequately analyzing debt service coverage ratio values and borrowers' abilities to perform on the loans;

h.    Failing to adhere to the Bank's LTV ratio limits;

i.    Failing to adhere to the Bank's LTC ratio limits;

j.    Failing to adhere to payment and renewal requirements by renewing credit without required payment of interest and principal reduction; and

k.    Causing FSNB to approve and fund CRE loans in which the project equity contribution from the borrower was not evaluated or was inadequate.

l.    Pursuing an aggressive ADC/CRE lending strategy that placed short-term income and profits ahead of compliance with the Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

m.    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

n.    Disregarding and failing to take appropriate steps to address advice and criticisms by regulators with respect to the Bank's ADC/CRE lending;

o.    Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

p.    Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

q.    Failing to ensure that ADC/CRE loans approved and/or ratified by the EAC were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

r.    Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices; failing to implement and monitor prudent risk management strategies; and

s.    Allowing officers of the Bank repeatedly to violate the Bank's loan policy, and approving and/or ratifying loans that were in material violations of the Bank's Loan Policy; and

t.    Failing to meet the standard of care required by O.C.G.A. §7-1-490 and common law with respect to the administration of the Bank's affairs.

53.    With regard to each Director Defendant, the general acts of negligence and gross negligence applicable to each Director Defendant are set forth in paragraphs 23-32 and 52.  In addition, specific deficiencies and violations

relating to the approval of illustrative Loan Transactions which are applicable to each Defendant and identified within paragraphs 33-43.

54.     As a direct and proximate result of the Defendants' negligence, FDIC-R suffered compensatory damages in an amount to be proven at trial.

55.     With respect to their negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. §1821(k)

56.     FDIC-R re-alleges and incorporates by reference each of the allegations in paragraphs 1-44 of this Complaint as though fully set forth herein.

57.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

58.     In the alternative, the acts and omissions of each of the Defendants, described particularly in paragraphs 23-43 and 50-52 of this Complaint, including without limitation disregard of regulators' advice, aggressive pursuit of overconcentration of ADC and CRE loans, deficiencies in loan underwriting and credit administration, and deterioration of the housing market, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise in the conduct of their own affairs.

59.     Without limiting the generality of the preceding paragraph, each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a.     Defendant Baker, by, among other things, failing to comply with the Bank's Loan Policy;  repeatedly failing to follow and failing to require adherence to the loan approval process; disregarding regulators' advice and criticisms regarding loan underwriting, risk management and loan concentrations, paragraph 30; failing to ensure that loans were underwritten in a safe and sound manner; approving loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, paragraphs 33-43; allowing the Bank's loan portfolio to be overconcentrated in speculative

ADC/CRE loans, including the Loan Transactions, in order to rapidly grow the Bank without adequate risk management controls, paragraphs 23-43, thereby causing Damages in an amount to be proven at trial.

b. Defendant Barber Sr., by among other things, failing to comply with the Bank's Loan Policy; pursuing a high risk, aggressive ADC/CRE loans strategy; failing to ensure that loans were underwritten in a safe and sound manner; disregarding regulators' advice and criticism regarding loan underwriting, risk management and loan concentrations, paragraph 30; originating and recommending for approval loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices, paragraphs 33-43, and allowing the Bank's loan portfolio to be overconcentrated in speculative ADC/CRE loans, including the Loan Transactions, paragraphs 23-32, thereby causing Damages in an amount to be proven at trial.

c. Each Director Defendant as a member of the EAC, by and among other things: failing to conduct proper due diligence and to be reasonably well informed prior to approving loans and;  failing to comply with the Bank's Loan Policy; disregarding regulators' advice and criticisms, paragraph 30; failing to ensure that loans were underwritten in a safe and sound manner, paragraphs 33-43; allowing the Bank's loan portfolio to be overconcentrated in speculative

ADC/CRE loans, including the Loan Transactions, paragraphs 23-32, thereby causing Damages in an amount to be proven at trial.

60.    As a direct and proximate result of the Defendants' gross negligence, FDIC-R has suffered Damages in an amount to be proven at trial.

61.    With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## REQUEST FOR RELIEF

62.    Pursuant to Federal Rule of Civil Procedure 38, FDIC-R demands a trial by jury on all claims.

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for First Security National Bank, requests entry of judgment in its favor against Defendants as follows:

1.    For compensatory damages, jointly and severally, in an amount to be proven at trial;

2.    For its costs of suit against all Defendants;

3.    For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l); and

35

4.     For such other and further relief as the Court deems just and

proper.

Respectfully submitted this 3rd  day of December, 2012.

> Respectfully submitted,
>
> SIMKINS HOLLIS LAW GROUP, PC
>
> /s/S. Paul Smith
> Jeanne Simkins Hollis
> Georgia Bar No. 646890
> S. Paul Smith
> Georgia Bar No. 663577
> Jacquelyn Smith
> Georgia Bar No. 320589
> 1924 Lenox Road, NE
> Atlanta, GA 30306
> (404) 391-4428 phone
> (770) 587-0726 FAX
> psmith@shlglaw.com
> *Attorney for the Federal Deposit*
> *Insurance Corporation, as Receiver*
> *for First Security National Bank*

## LR 7.1 CERTIFICATE

Pursuant to L.R. 7.1D, counsel certifies that the foregoing Complaint complies

with the font and point selections approved by the Court in L.R. 5.1.C.  This

Complaint was prepared using Times New Roman font, 14-point.

> /s/S. Paul Smith
> S. Paul Smith
> Simkins Hollis Law Group, P.C.

## Exhibit A

| The 17 Loan Transactions | | | | | Loan Approval Votes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Credit Amt. ($millions) | Approval Date | Loss ($millions) | Deficiencies | Baker | Barber Jr. | Barber Sr. | Conway | Gardner | Howington | Smith |
| 1.  GM | [i]$2.100 | Dec. 20, 2005 | $0.155 | 1, 3 | x | x | x | x | x | x | x |
| 2.  MC | $1.674 | Mar. 21, 2006 | $1.266 | 1, 6, 8 | x | x | x | x | x | x | x |
| 3.  RMCH | [i]$2.100 | Mar. 21, 2006 | $0.478 | 6, 7 | x | x | x | x | x | x | x |
| 4.  TBE | [i]$1.067 | Apr. 18, 2006 | $0.720 | 3 | x | x | x | x | x | x | x |
| 5.  TP | $0.749 | Apr. 18, 2006 | $0.470 | 2, 3, 5 | x | x | x | x | x | x | x |
| 6.  DH | $0.978 | Aug. 15, 2006 | $0.222 | 1, 3, 8 | x | x | x | x | x | x | x |
| 7.  RMCH | [a]$0.125 | Aug. 15, 2006 | $0.070 | 6, 7 | x | x | x | x | x | x | x |
| 8.  VH | $1.141 | Sept. 19, 2006 | $0.814 | 1, 2, 3 | x | x | x | x | x | x |  |
| 9.  577TS | [i]$1.440 | Sept. 19, 2006 | $0.431 | 1, 2, 3 | x | x | x | x | x | x |  |
| 10. SH | $1.327 | Oct. 24, 2006 | $0.243 | 5, 8 |  |  |  |  | x | x |  |
| 11. SC | $1.575 | Dec. 19, 2006 | $1.199 | 2, 3, 8 |  |  |  |  | x | x |  |
| 12. TBE | [a]$0.101 | Jan. 16, 2007 | $0.100 | 3, 4, 6 | x | x | x | x | x | x |  |
| 13. WCH | $0.756 | Jan. 16, 2007 | $0.139 | 1-3, 5, 8 | x | x | x | x | x | x |  |
| 14. GM | [a]$0.300 | Feb. 20, 2007 | $0.208 | 1, 3 | x | x | x | x |  |  | x |
| 15. 577TS | [a]$0.375 | Mar. 20, 2007 | $0.080 | 1, 3 | x | x | x | x |  |  |  |
| 16. WW | $0.874 | June 21, 2007 | $0.115 | 1, 3, 5, 8 | x | x | x |  | x | x | x |
| 17. TP | $1.863 | Feb. 19, 2008 | $0.886 | 1, 3, 5 | x | x | x |  | x | x | x |
| **TOTAL** | **$18.545** | | **$7.596** | | | | | | | | |

Key to Second Column ("Credit Amount") in the table:  "i" = initial loan, "a" = additional credit

Key to Fifth Column ("Deficiencies") in the table:
1 = violation of debt service coverage requirement
2 = transaction lacked sufficient supporting appraisal
3 = borrower lacked earnings and cash flow to support the debt
4 = financial information supporting commitment incomplete or stale
5 = non-compliance with borrower equity requirements
6 = violation of established LTV or LTC ratio limits
7 = credit renewed without required payment of interest and principal reduction
8 = credit granted without required unconditional guarantee of all project sponsors